UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA,
ex rel. BILL LOCKYER, Attorney
General,                                       No. 2:05-cv-0211-MCE-GGH

          Plaintiff,

     v.                                        <u>MEMORANDUM AND ORDER</u>

UNITED STATES DEPARTMENT OF
AGRICULTURE; MIKE JOHANNS,
Secretary of the Department of
Agriculture; MARK REY, Under
Secretary of the Department of
Agriculture; UNITED STATES FOREST
SERVICE; DALE BOSWORTH, Chief,
United States Forest Service; and
BERNARD WEINGARDT, Regional Forester,
Pacific Southwest Region, United
States Forest Service,

          Defendants.

     and

TUOLUMNE COUNTY ALLIANCE FOR
RESOURCES & ENVIRONMENT, et al.;
CALIFORNIA SKI INDUSTRY ASS'N;
QUINCY LIBRARY GROUP, et al.;
and CALIFORNIA CATTLEMEN'S ASS'N,

          Defendants-Intervenors.

                    ----oo0oo----

1

1        Through this lawsuit, Plaintiff Bill Lockyer, on behalf of

2   the People of the State of California (hereinafter "Plaintiff")

3   challenges the 2004 Sierra Nevada Forest Plan Amendment

4   ("SNFPA"), commonly known as the 2004 Framework.  Defendants are

5   sued in their official capacities as representatives of the

6   United States Forest Service. ("Forest Service")  Plaintiff

7   contends that the 2004 Framework runs counter to the provisions

8   of both the Administrative Procedures Act ("APA") and the

9   National Environmental Policy Act of 1969 ("NEPA").  Presently

10  before the Court are cross motions for summary judgment filed on

11  behalf of both the Plaintiff and Defendants.

12

13                        **FACTUAL BACKGROUND**

14

15       The Sierra Nevada contains some 11.5 million acres of

16  National Forest Service land with eleven National Forests and

17  encompasses "dozens of complex ecosystems each with numerous,

18  inter-connected social, economic and ecological components."

19  SNFPA 1920.  In the late 1980s, the Forest Service began

20  developing a comprehensive strategy for managing the myriad

21  resources found within the region.  In 1995, the Regional

22  Forester for the Pacific Southwest Region of the Forest Service

23  issued a draft Environmental Impact Statement ("EIS") outlining

24  its management proposal.  SNFPA 229.[1]

25  ///

26  ///

27  _____

28       [1] Documents found within the first eight-volume record are
    cited as SNFPA, followed by the Bates-stamp number.

                                2

After extensive public participation and the preparation of a
Final EIS ("FEIS") responding to public concerns, the Regional
Forester issued, in 2001, a Record of Decision ("ROD") which
adopted management objectives in five major areas: old forest
ecosystems; aquatic, riparian, and meadow ecosystems; fire and
fuels; noxious weeds; and hardwood ecosystems on the lower
westside of the Sierras.  Id. at 231-35.

Among the thorniest issues confronted by the ROD was
striking the appropriate balance between balancing the excessive
fuel buildups occasioned by decades of fire repression and
conserving key habitat for wildlife species dependent on old
forest environments.  The 2001 ROD included a network of "old
forest emphasis areas" across about 40 percent of all national
forest land in the Sierra Nevada that was designed to provide a
contiguous network of old forest ecosystems conducive to species
preferring such habitat like the California Spotted Owl, the
American Marten and the Pacific Fisher.  SNFPA 236.  Aside from
other areas slated for specific treatment (like a limited "urban
wildland intermix" designed to create a buffer between developed
areas and the forest), the 2001 Framework specified a "general
forest" land allocation intended to increase the density of large
old trees and the continuity and distribution of old forests
across the landscape.  SNFPA 236-37.

In order to protect old forest conditions within its
specific areas of emphasis, the 2001 Framework generally
prohibited logging that would remove trees over 12 inches in
diameter or logging that would reduce canopy cover by more than
10 percent.  SNFPA 328.

3

1   Even within the "general forest" areas, the 2001 Framework
2   prohibited logging of trees over 20 inches in diameter.  SNFPA
3   336.  It was only within the intermix zones that no canopy
4   restrictions were imposed and logging of trees up to 30 inches
5   was permitted.  SNFPA 333, 315.

6       Although the Forest Service ultimately affirmed adoption of
7   the 2001 ROD despite receipt of approximately 200 administrative
8   appeals, it nonetheless directed the Regional Forester to conduct
9   an additional review with respect to specific concerns like
10  wildfire risk and the Forest Service's responsibilities under the
11  Herger-Feinstein Quincy Library Group Forest Recovery Act ("HFQLG
12  Act"), a congressional mandate which established a Pilot Program
13  for fire suppression through a combination of fire breaks, group
14  selection logging and individual logging.  SNFPA 1918.  A
15  management review team was assembled by the Regional Forester for
16  this purpose.

17      In March 2003, the team concluded that the 2001 ROD's
18  "cautious approach" to active fuels management had limited its
19  effectiveness in many treatment areas.  The management review
20  team further found that revisions to vegetation management rules
21  would decrease flammable fuels while protecting critical wildlife
22  habitat by guarding against the risk of stand-replacing wildfire.
23  See SNFPA 1918, 1926.

24  ///
25  ///
26  ///
27  ///
28  ///

4

Moreover, with respect to the California Spotted Owl ("CASPO" or "owl"), the team felt that the 2001 ROD had unnecessarily "took a worst case approach to estimating effects" on the owl.  SNFPA 1968.[2]  In addition to citing recent research indicating that habitat losses resulting from fuel treatments were less than previously believed, the team further found that the 2001 ROD's extensive reliance on maintaining extensive canopy cover was impracticable to implement.

Following receipt of the team's findings, the Regional Forester ordered that management strategy alternatives in addition to those considered in the 2001 FEIS be considered.  A draft supplemental environmental impact statement ("DSEIS") was thereafter released to the public in January 2004.  While the same five areas of concern were targeted in the DSEIS as in its 2001 predecessor, in 2004 a new action alternative was identified (Alternative S2), in addition to the alternative selected by the 2001 Framework (Alternative S1) and the seven alternatives that had previously been considered before adoption of the 2001 Framework (Alternatives F2-F8).[3]

///

---

[2] The 2001 Framework's CASPO analysis was largely predicated on a July 1992 report (the "CASPO Report") that recommended establishment of a 300-acre Protected Activity Center ("PAC") around all known owl nest sites, a complete prohibition of logging within the PACs, more limited logging prohibition of trees over 30 inches in diameter in all habitat suitable for owl nesting and foraging, and a prohibition on logging that would reduce canopy cover below 40 percent in owl nesting habitat. SNFPA 1037-40.

[3] The DSEIS also considered seven additional alternatives in addition to those considered in detail but eliminated the seven from extensive consideration because they were found to be inconsistent with the purpose and need of the DSEIS. SNFPA 3163-65.

5

Following the public comment period after dissemination of the DSEIS, the SEIS in final form also included response to various issues raised, including comments by the United States Fish and Wildlife Service, by the United States Environmental Protection Agency, by California resources protection agencies, and by the Science Consistency Review ("SCR") team.[4]

By adopting the SEIS on January 21, 2004, the Regional Forester replaced the 2001 ROD with its 2004 successor and amended the forest plans for all eleven national forests situated in the Sierra Nevada.  SNFPA 2987-3061.  The 2004 ROD reasoned that the 2001 Framework "prescribed technical solutions that do not produce needed results, or offered methods we often dare not attempt in the current Sierra Nevada."  SNFPA 2995.  The 2004 Framework reasoned that the methods as adopted in 2001 fail to reverse the damage, and growing threat, of catastrophic fires quickly enough.  Id.

The Chief of the Forestry Service ultimately affirmed the 2004 ROD,[5] with the direction that details of the ROD's adaptive management be submitted to him within six months.  SNFPA 3997-4305.  The Regional Forester submitted that supplemental information to the Chief on March 31, 2005.

///

///

[4] The SCR consisted of eleven scientists convened by the Pacific Southwest Research Station in Davis, California, and included experts in fire and fuels management, forest ecology, and species viability.  SNFPA 3503.

[5] In so affirming, Forest Service Chief Dale Bosworth denied 6,241 separate administrative appeals of the 2004 Framework. SNFPA 3998.

6

1    Through the present lawsuit, Plaintiffs allege that the 2004
2  Framework as ultimately adopted runs afoul of both the APA and
3  NEPA on a programmatic basis.  Specifically, Plaintiff contends
4  that the 2004 Framework violates the APA because it failed to
5  include a reasoned analysis for changing the approach advocated
6  by its predecessor, the 2001 Framework.  Moreover, Plaintiffs
7  also argue that the 2004 Framework runs afoul of NEPA because it
8  was adopted without either adequate disclosure of its significant
9  environmental impacts or consideration of reasonable alternatives
10 to the selected approach.

11

12                       **PROCEDURAL FRAMEWORK**

13

14   Congress enacted NEPA in 1969 to protect the environment by
15 requiring certain procedural safeguards before an agency takes
16 action affecting the environment.  The NEPA process is designed
17 to "ensure that the agency ... will have detailed information
18 concerning significant environmental impacts; it also guarantees
19 that the relevant information will be made available to the
20 larger [public] audience."  Blue Mountains Biodiversity Project
21 v. Blackwood, 171 F.3d 1208, 121 (9th Cir. 1998).  The purpose of
22 NEPA is to "ensure a process, not to ensure any result."  Id.
23 "NEPA emphasizes the importance of coherent and comprehensive up-
24 front environmental analysis to ensure informed decision-making
25 to the end that the agency will not act on incomplete
26 information, only to regret its decision after is it too late to
27 correct."  Center for Biological Diversity v. U.S. Forest Serv.,
28 349 F.3d 1157, 1166 (9th Cir. 2003).

Complete analysis under NEPA also assures that the public has sufficient information to challenge the agency's decision. Robertson v. Methow Valley Citizens, 490 U.S. 332, 349 (1989); Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1151 (9th Cir. 1998).

NEPA requires that all federal agencies, including the Forest Service, prepare a "detailed statement" that discusses the environmental ramifications, and alternatives, to all "major Federal Actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).  An agency must take a "hard look" at the consequences, environmental impacts, and adverse environmental effects of a proposed action within an environmental impact statement ("EIS"), when required.  Kleppe v. Sierra Club, 427 U.S. 390, 410, n.21 (1976).

NEPA does not mandate that an EIS be based on a particular scientific methodology, nor does it require a reviewing court to weigh conflicting scientific data.  Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985). An agency must be permitted discretion in relying on the reasonable opinions of its own qualified experts, even if the court might find contrary views more persuasive. See, e.g., Kleppe, 427 U.S. at 420, n. 21.  NEPA does not allow an agency to rely on the conclusions and opinions of its staff, however, without providing both supporting analysis and data.  Idaho Sporting Cong., 137 F.3d at 1150. Credible scientific evidence that contraindicates a proposed action must be evaluated and disclosed.  40 C.F.R. § 1502.9(b).

///

1    Because NEPA itself contains no provisions allowing a

2    private right of action (see Lujan v. National Wildlife

3    Federation, 497 U.S. 871, 882 (1990)), a party can obtain

4    judicial review of alleged violations of NEPA only under the

5    waiver of sovereign immunity contained within the Administrative

6    Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Earth Island

7    Institute v. U.S. Forest Serv., 351 F.3d 1291, 1300 (9th Cir.

8    2005).

9    Under the APA, the court must determine whether, based on a

10   review of the agency's administrative record, agency action was

11   "arbitrary and capricious," outside the scope of the agency's

12   statutory authority, or otherwise not in accordance with the law.

13   Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356

14   (9th Cir. 1994).  Review under the APA is "searching and

15   careful."  Ocean Advocates, 361 F.3d at 1118.  However, the court

16   may not substitute its own judgment for that of the agency.  Id.

17   (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401

18   U.S. 402 (1971), overruled on other grounds by Califano v.

19   Sanders, 430 U.S. 99 (1977)).

20   In reviewing an agency's actions, then, the standard to be

21   employed is decidedly deferential to the agency's expertise.

22   Salmon River, 32 F.3d at 1356.  Although the scope of review for

23   agency action is accordingly limited, such action is not

24   unimpeachable.  The reviewing court must determine whether there

25   is a rational connection between the facts and resulting judgment

26   so as to support the agency's determination.

27   ///

28   ///

9

1  Baltimore Gas and Elec. v. NRDC, 462 U.S. 87, 105-06 (1983),

2  citing Bowman Trans. Inc. v. Arkansas-Best Freight Sys. Inc., 419

3  U.S. 281, 285-86 (1974).  An agency's review is arbitrary and

4  capricious if it fails to consider important aspects of the

5  issues before it, if it supports its decisions with explanations

6  contrary to the evidence, or if its decision is either inherently

7  implausible or contrary to governing law.  The Lands Council v.

8  Powell, 395 F.3d 1019, 1026 (9th Cir. 2005).

9

10                              **STANDARD**

11

12      Summary judgment is an appropriate procedure in reviewing

13  agency decisions under the dictates of the APA.  See, e.g.,

14  Northwest Motorcycle Assn. v. U.S. Dept. Of Agric., 18 F.3d 1468,

15  1471-72 (9th Cir. 1994).  Under Federal Rule of Civil Procedure

16  56, summary judgment may accordingly be had where, viewing the

17  evidence and the inferences arising therefrom in favor of the

18  nonmovant, there are no genuine issues of material fact in

19  dispute."  Id. at 1472.  In cases involving agency action,

20  however, the court's task "is not to resolve contested facts

21  questions which may exist in the underlying administrative

22  record", but rather to determine whether the agency decision was

23  arbitrary and capricious as defined by the APA and discussed

24  above.  Gilbert Equipment Co., Inc. v. Higgins, 709 F. Supp.

25  1071, 1077 (S.D. Ala. 1989); aff'd, Gilbert Equipment Co. Inc. v.

26  Higgins, 894 F.2d 412 (11th Cir. 1990); see also Occidental Eng'g

27  Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985).

28  ///

                                 10

Consequently, in reviewing an agency decision, the court must be "searching and careful" in ensuring that the agency has taken a "hard look" at the environmental consequences of its proposed action.  Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846, 858-59 (9th Cir. 2005);  Or. Natural Res. Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997).

**ANALYSIS**

**I.  STANDING**

According to Defendants, Plaintiff has failed to demonstrate the requisite standing for proceeding with this lawsuit because he has submitted no evidence that the State of California's natural resources will be impacted.  Defendants correctly point out that determining whether an adequate "case or controversy" exists between litigating parties is a critical threshold inquiry in every federal case.  Warth v. Seldin, 422 U.S. 490, 498 (1975).  Vital in satisfying the case or controversy requirement is the doctrine of standing which requires a plaintiff to have suffered a "concrete and particularized" injury which is "actual or imminent" rather than "conjectural or hypothetical," and can be fairly traced to the actions of a defendant.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

///

///

///

///

///

11

Despite Defendants' contentions to the contrary, however, the detailed allegations of Plaintiff's Complaint herein are in and of themselves sufficient to confer standing in this matter. To establish Article III standing based on alleged procedural injuries like those guaranteed by NEPA and the APA, a plaintiff need only show 1) that defendants violated certain procedural rules; 2) that the rules existed to protect plaintiff's concrete interests; and 3) that it is reasonably probable that the challenged action threatens those concrete interests. <u>City of Sausalito v. O'Neill,</u> 386 F.3d 1186, 1197 (9th Cir. 2004); <u>see also</u> <u>Citizens for Better Forestry v. U.S. Dept. Of Ag.,</u> 341 F.3d 961, 969-70 (9th Cir. 2003).

In <u>City of Sausalito,</u> the Ninth Circuit found standing on the part of Sausalito to sue the National Park Service under NEPA.  The court held that the City's "concrete interests" included "proprietary interests" that are "as varied as a municipality's responsibilities, powers, and assets." <u>Id</u>. at 1197.  Such interests included the City's interest in protecting its ability to enforce its land use and health regulations and in preventing effects to its natural resources, its city-owned land, and its "aesthetic appeal." <u>Id</u>. at 1198-99.  The court determined that it was reasonably probable that the project proposed by the Park Service threatened Sausalito's concrete interests, through the possibility of "a detrimental increase in traffic and crowds...., affecting city-owned streets as well as municipal management and public safety functions." <u>Id</u>.

///

///

12

The Ninth Circuit also identified an "aesthetic injury" due to congestion that "will destroy the City's quiet, beauty, serenity and quaint and historic village character and attributes"; and "injury to Sausalito's natural resources" due to an increase in noise and trash, degraded air quality, and harm to the marina, parks and shoreline.  Id.; see also City of Davis v. Coleman, 521 F.2d 661 (9th Cir. 1975).

The considerations weighed and deemed sufficient to confer standing in City of Sausalito apply with equal force in this case.  Plaintiff is authorized by law to protect its varied interests from harm, interests which reflect the State of California's own unique responsibilities, powers and assets.  By operation of law and a factual matter, California owns, and holds in trust for its population, all wildlife, water, state-owned land, and public trust lands in and around the Sierra Nevada.  See, e.g., Betchart v. Cal. Dept. of Fish and Game, 158 Cal. App. 3d 1104, 1106-07 (1984) (wildlife); Cal. Water Code § 102 (water).  To the extent Plaintiff has identified violations of APA and NEPA bearing upon such resources, it is reasonably probable that such violations will threaten California's concrete, proprietary interests.

California may sue under the APA and NEPA because it falls within the APA's broad definition of a "person... adversely affected or aggrieved by agency action."  5 U.S.C. § 702; see also 5 U.S.C. § 551(2).  The Attorney General is also authorized, under common law, to file any civil action directly involving the rights and interests of the state in the absence of any legislative restriction.

D'Amico v. Board of Medical Examiners, 11 Cal. 3d 1, 14-14 (1974); People v. Birch Sec. Co., 86 Cal. App. 2d 703, 707 (1948); People v. Stratton, 25 Cal. 242, 248 (1864); see also Cal. Govt. Code §§ 12511, 12512.

Moreover, in approving the 2004 Framework and upholding it on administrative appeal, the Forest Service has made a final administrative determination that is subject to review under the APA.  5 U.S.C. § 702.  The procedural injuries alleged by California clearly fall within the zone of interests that the APA and NEPA are designed to protect because the Attorney General brings this action to protect the environment and natural resources of this state.  Defendants' challenge to Plaintiff's lawsuit on standing grounds consequently fails.

**II.   CLAIMS UNDER THE APA THAT DEFENDANTS FAILED TO PROVIDE THE REQUISITE "REASONED ANALYSIS" FOR ADOPTION OF THE 2004 FRAMEWORK**

Plaintiff's independent APA challenge (as set forth in the First Cause of Action) is predicated on the contention that the Forest Service summarily rejected the 2001 Framework without identifying any sufficient new information or changed circumstances and without reconciling its abrupt change of course with previous findings to the effect that permitting more flexibility for fuel treatments in old-growth forests posed an unacceptable risk to the long-term sustainability of the Sierra Nevada's habitat, wildlife, and ecosystems.

///

///

1   In response to Plaintiff's claim that the Bush
2 Administration promptly jettisoned the 2001 Framework developed
3 by the prior administration after assuming office, Defendants
4 correctly point out that "a change in administration brought
5 about by the people casting their votes is a perfectly reasonable
6 basis for an executive agency's reappraisal of the costs and
7 benefits of its programs and regulations."  Motor Vehicle Mfrs.
8 Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S.
9 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting
10 in part).  In National Cable & Tel. Ass'n v. Brand X Internet
11 Servs. ("Brand X"), 545 U.S. 967 (2005), the Supreme Court again
12 reiterated that a new administration may lawfully elect to modify
13 its predecessor's policies:

14      "An initial agency interpretation is not instantly
        carved in stone.  On the contrary, the agency.... must
15      consider varying interpretations and the wisdom of its
        policy on a continuing basis, [citation omitted], for
16      example, in response to changed factual circumstances
        or a change in administration...
17

18 Id. at 981 (internal quotations and citations omitted); see also
19 Gorbach v. Reno, 179 F.3d 1111, 1123-24 & n.16 (6th Cir. 1999)
20 (federal agencies have "inherent authority to reconsider their
21 own decisions," as the power to decide includes the power to
22 reach a different conclusion).

23      Nonetheless, to the extent that the 2004 Framework
24 represented a significant departure from the policies embodied by
25 its 2001 predecessor, the rationale for that change must be
26 adequately articulated.  As long as the agency provides a
27 procedural explanation for the change of course, the APA is
28 satisfied.

15

1   Brand X, 545 U.S. at 981; Springfield Inc. v. Buckles, 292 F.3d

2   813, 819 (D.C. Cir. 2002).  An agency changing its course must

3   "supply a reasoned analysis for the change beyond that which may

4   be required when an agency does not act in the first instance."

5   See Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.,

6   463 U.S. at 42.  "[T]he agency must examine the relevant data and

7   articulate a satisfactory explanation for its action including a

8   rational connection between the facts found and the decision

9   made."  Id. at 43.  The standard of review to be employed is not

10  whether an agency's decision is supported by substantial

11  evidence; instead, the Court must uphold a decision for which an

12  administrative hearing is not required unless it is arbitrary or

13  capricious because the requisite reasoned analysis is lacking.

14  See 5 U.S.C. § 706(2)(A); Wilderness Soc'y v. Thomas, 188 F.3d

15  1130, 1136 (9th Cir. 1999).

16      In analyzing the propriety of the 2004 Amendment, it should

17  also be noted that claims under the APA must be viewed in light

18  of the substantive statutory authority under which the agency

19  acts.  The National Forest Management Act ("NFMA"), which

20  establishes criteria for stewardship of the nation's forests,

21  allows the Forest Service to adopt an amendment to a forest plan

22  at any time.  16 U.S.C. § 1604(f)(4).  Significantly, too, the

23  NFMA goes on to require that the Forest Service "provide for

24  multiple use and sustained yield" of products and services,

25  including "coordination of outdoor recreation, range, timber,

26  watershed, wildlife and fish, and wilderness."  16 U.S.C.

27  § 1604(e)(1).

28  ///

16

In striking the appropriate balance of resources the Forest
Service is also expected to "provide for diversity of plant and
animal communities (1604(g)(3)(B), and to maintain viable
populations of species. <u>See</u> 36 C.F.R 219.19 (1982); SNFPA 3011.
The case law confirms that forest planning statutes incorporate
considerations of multiple use. <u>Sierra Club v. Espy</u>, 38 F.3d
792, 795 (5th Cir. 1994).

The burden is on Plaintiff to demonstrate that the Forest
Service's action is flawed; otherwise, the agency's action is
given a presumption of regularity. <u>See</u> <u>Clyde K. v. Puyallup</u>
<u>School Dist., No. 3</u>, 35 F.3d 1396, 1398 (9th Cir. 1994).  This
confers broad discretion to the Forest Service in its balancing
of different resource uses, including timber and wildlife.  Such
discretion permits the Forest Service to determine the mix of
uses that best suits the public interest.  <u>See</u> 16 U.S.C. § 529
(directing Secretary of Agriculture to administer the National
Forest Service for multiple uses and sustained yield); <u>Perkins v.</u>
<u>Bergland</u>, 608 F.2d 803, 806 (9th Cir. 1979) (the mandate to
manage for multiple uses "'breathe[s] discretion at every pore.'"
(citation omitted);  <u>Intermtn. Forest Ass'n v. Lyng</u>, 683 F. Supp.
1330, 1337-38 (D. Wyo. 1988).

Discretion in managing for multiple use is reflected in
pertinent forest management statutes and is also incorporated
into the forest planning.  Where the factual issue concerns an
opinion or judgment on some environmental or silvicultural
matter, on such a "scientific determination.... a reviewing court
must generally be at its most deferential."
///

17

Baltimore Gas & Elec. Co. v. Natural Resources Def. Council, 462 U.S. 87, 103 (1983).  An "agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  Marsh v. Oregon, 490 U.S. 360, 378 (1989).

Having determined that considerations of multiple use may be reweighed by the Forest Service, we now turn to specific resource considerations in assessing whether the Forest Service provided the requisite "reasoned analysis" in adopting the provisions of the 2004 Framework.

**A.   Fire and Fuels Management**

Contrary to Plaintiff's contention, the record does contain support for the Forest Service's conclusion that the 2004 Framework would better address fire and fuels concerns than its predecessor.  The Management Review Team (assembled by the Regional Forester to address specific concerns raised by the Forest Service following adoption of the 2001 Framework) evaluated the fuels strategy encompassed in the 2001 Framework and identified three critical areas meriting improvement.  SNFPA 3100-3101.  First, the Team identified the need for fuel treatments to be strategically placed across the landscape. Secondly, the group recommended that enough material be removed to ensure that wildfires burn at lower intensities and slower speeds in treatment areas.

///

///

18

1  Finally, the Management Review Team recognized the need for cost

2  efficient reduction measures that would allow program goals to be

3  accomplished within the confines of appropriated funds.  Id.

4      The 2004 Framework, in response to those suggestions,

5  provides more flexibility to strategically locate treatments

6  across the landscape.  SNFPA 3290, 3291.  Because the 2004

7  Framework does not restrict the location of mechanical treatments

8  as much as the 2001 ROD, fire behavior can more effectively be

9  modified than under the 2001 Framework, which dramatically

10  limited such treatments in many areas.  See SNFPA 2995; 3290,

11  3291 (comparing rate of spread, flame length, scorch height, and

12  projected mortality).  The 2004 Framework also results in the

13  removal of more hazardous fuels, making mechanical treatment more

14  effective.  See SNFPA 3290 (noting that the effectiveness of

15  mechanical treatments under the 2001 ROD was "greatly

16  compromise[d]" by the fact that 30 percent of the acreage

17  treatment was limited to removing trees less than six inches in

18  diameter).  Finally, the increased cost efficiency of the 2004

19  Framework is illustrated by the fact that while its more

20  comprehensive treatment objectives would be higher and cost more

21  to implement, it would also generate 3.5 times more revenue

22  annually to offset the higher costs necessary to more effectively

23  reduce fire risk to the landscape.  See SNFPA 3293-94.  The fact

24  that the 2004 Framework addressed the concerns voiced by the

25  Management Review Team with regard to its 2001 predecessor

26  provides a reasoned basis for changing the Forest Service's

27  approach to fire and fuels management, thereby satisfying the

28  APA.

1    In addition, it was reasonable for the Forest Service to

2    choose a treatment option that, after a decade of implementation,

3    would result in fewer acres experiencing stand-replacing[6]

4    wildfires.  See SNFPA 3287, 3288.  Significantly, too, the

5    management review team also identified numerous practical

6    difficulties in implementing the 2001 Framework in any event.  It

7    identified difficulties in classifying vegetation at the small

8    (one-acre increment) scale required by the 2001 ROD that made it

9    subject to inconsistent classification.  See SNFPA 1947, 3290-01,

10   3612.  It further found that the 2001 Framework relied upon

11   relatively small discrepancies in canopy cover that were

12   difficult to consistently measure with any precision.  SNFPA

13   1946-48.  Importantly, also, more than 80 percent of district

14   rangers responding to a survey reported that 2001 Framework

15   standards and guidelines prevented effective treatment.  SNFPA

16   1928, see also SNFPA 2995.

17   It must further be emphasized that there is adequate support

18   in the record for the proposition that the 2004 Framework would

19   better meet the Forest Service's goal of moving forest landscapes

20   towards a natural fire regime which, in the long run, would

21   result in more effective fuels treatment.  See SNFPA 3287, 3288

22   (Table 4.2.4a, Figure 4.2.4b).

23   ///

24   ///

25   ///

26

27        [6] A stand-replacing fire is one where most or all vegetation
     is killed, thereby destroying associated habitat for existing
28   species.  See SNFPA 3287.

20

The Sierra Nevada faces a situation where nearly 8 million of the 11.5 million acres that comprise national forests in the region are in vegetation condition classes that pose moderate to high risks from wildland fires.  SNFPA 2998.[7]   The proliferation of smaller, less fire-resistant tree species (which under natural conditions had kept in check by widespread, low severity fires) has created a highly-combustible fuel bed, as well as a fire ladder serving to carry ground fire into the crowns of larger trees.  Given that potential tinderbox, it was reasonable for the Forest Service to explore and adopt measures to more effectively address fire danger by reducing the understory of smaller and less desirable vegetation.   The 2004 Framework points out that the magnitude of this increasing danger has been borne out by devastating fires throughout the Western United States in recent years that has occasioned an "unacceptable loss of life, property and critical habitat" calling out for a more effective alteration of current forest conditions.  Id.

     Given such conditions, it was understandable that the current Administration felt less comfortable with the 2001 approach of fighting "fire with fire", which relied more heavily on prescribed burning to reduce overly-dense forests with the hope those fires did not get out of control.

///

_____

[7] This acreage has been denoted as falling within Classes 2 and 3, which represent areas where fire regimes have been so altered from their historic range of fire return interval that they are at "moderate risk of losing key ecosystem components" due to wildland fire (Class 2) and areas which are at "greatest risk of ecological collapse" because it has been so long since fire operated as a process in the ecosystem.  Id.

1    This constituted a rational basis for moving, as the 2004
2    Framework did, to greater reliance on mechanical methods for
3    thinning overly dense forests.  SNFPA 2995.

4         At the same time, much of the increased fuel treatments
5    entailed within the 2004 Framework were attributable to full
6    implementation of the HFQLG Act Pilot Project, which, as stated
7    above, represented a congressional mandate to test the efficacy
8    of improved fires suppression through a combination of fire
9    breaks, group selection logging and individual logging.  SNFPA
10   1918.  The Management Review Team found that the 2001 ROD
11   "severely limit[ed]" implementation of the HFQLG Pilot Project,
12   as it did not allow the full extent of group selection envisioned
13   by the HFQLG Act.  SNFPA 1967, 1970.  Experimentation with such
14   techniques is a valuable tool in refining adaptive management
15   techniques, whereas the 2001 Framework's more passive approach
16   reduced the ability to experiment and obtain information.  See
17   SNFPA 3001-02, 3139-43.  Such experimentation is anticipated by
18   the provisions of the NFMA (16 U.S.C. § 1604(g)(3)(C), and the
19   management review team concluded that a new direction could more
20   thoroughly test group selection and better fulfill the goals of
21   the HFQLG Act.  SNFPA 1967, 1970; see also SNFPA 3002.

22        In addition to finding that the impacts to the owl
23   occasioned by full implementation of the Pilot Project were less
24   than originally believed (as discussed in more detail, infra),
25   the Team also found that the community stability goals of the
26   HFQLG Act were not being met.
27   ///
28   ///

1  See SNFPA 1967, 1968 (a "key component" of the Pilot Project is

2  to "provide socio-economic benefit through timber and biomass

3  production, and therefore enhance community stability in the

4  project area."); SNFPA 1969, 1970 (the community stability, and

5  socio-economic aspects of the Pilot Project are not being

6  implemented"); SNFPA 3001.  See SNFPA 3386, 3697 ("Alternative S2

7  is designed to better meet[] the goals envisioned by the Pilot

8  Project and will contribute toward producing socio-economic

9  benefits of enhancing community stability in the pilot project

10 area.").  Timber production is a legitimate objective in national

11 forest management and is one of the competing resources the

12 Forest Service is responsible for managing.

13      Finally, while Plaintiff appears to argue that Defendants

14 should not be permitted to fund forest management through timber

15 revenue as opposed to congressional appropriation, the Forest

16 Service appropriately counters that it seeks to maximize, rather

17 than replace, the dollars it receives through such appropriation.

18 See SNFPA 3100 (increasing the economic value of wood byproducts

19 would improve the ability to "treat the desired acreage of

20 hazardous fuels with available appropriated dollars"); SNFPA

21 3583, 3584 (2004 Framework would allow treatments to "generate

22 revenues through commercial forest products to increase the

23 number of acres that can be treated with the available

24 appropriated funds").

25 ///

26 ///

27 ///

28 ///

1   Because the record contains adequate support for the

2   conclusion that the 2004 Framework would more effectively reduce

3   landscape fuels, would better protect communities from the risk

4   of catastrophic wildfire, and would further permit fulfillment of

5   the legitimate objectives of the congressionally mandated HFQLG

6   Act, the change in resource use and emphasis represented by the

7   2004 Framework's provisions concerning fuels and fire managements

8   well within the agency's statutory discretion and consequently do

9   not run afoul of the provisions of the APA.  By revisiting the

10  unnecessary assumptions of the 2001 Framework and by better

11  providing for community stability, the Forest Service decided

12  upon a different resource balance that would address both the

13  needs of wildlife and the duty under the HFQLG Act to fully

14  implement the Pilot Project.  <u>See</u> SNFPA 3338-39, 3608-09.

15

16  **B.  Effects Upon the California Spotted Owl**

17

18  Paramount in the assumptions underlying the 2001 Framework

19  was the belief that owls would be negatively affected by more

20  intensive forest management practices and by full implementation

21  of the HFQLG Act.  Plaintiff argues that no new information on

22  impacts to the owl justified any increase in fuel treatment and

23  timber harvesting in the old forest habitat preferred by the owl.

24  Absent the "reasoned analysis" of such new information, Plaintiff

25  asserts that implementation of the 2004 Framework is arbitrary

26  and capricious, thereby contravening the APA.

27  ///

28  ///

24

1    The state's position in this regard appears unwarranted.

2  The Management Review Team appointed by the Regional Forester

3  reassessed the owl analysis relied upon by the 2001 Framework and

4  determined that a new evaluation was warranted.  The Team found

5  that the 2001 ROD inappropriately relied upon the analysis of the

6  HFQLG biological assessment/biological evaluation ("BA/BE"),

7  which "took a worst case approach to estimating effects" on the

8  owl and was unnecessarily conservative.  SNFPA 1968.  The Team

9  also concluded that "the assessment of owl home range condition

10 in the 2001 EIS is not consistent with the research findings upon

11 which it is based and may not be representative of the current

12 status of owl habitat."  SNFPA 1951.

13    This assessment was borne out by the findings contained in a

14 so-called "meta-analysis"[8] prepared by a team of sixteen

15 scientists organized by the Forest Service's Pacific Southwest

16 Region Station.  The results of that analysis, which used data

17 gathered from five owl demographic studies to assess population

18 status and trends, were published in 2003 and included a new

19 approach in estimating the rate of change in owl populations.

20 SNFPA 3213.  Those results suggested that the rate of owl

21 population decline was not as great as originally predicted in

22 the 2001 EIS.  SNFPA 3214.  In fact, the meta-analysis shows

23 evidence of one apparently stable population, and the other owl

24 populations assessed failed to exhibit any statistically

25 significant difference from that stable population.  See SNFPA

26 1949.

27 ────────────────

28    [8] A "meta-analysis" is an analytical (mathematical) tool to
evaluate population status and trends over time.  SNFPA 3213.

1    The meta-analysis was just one of numerous pieces of new
2  information considered in the SEIS.  See SNFPA 3213-3218 (listing
3  other new information and analyses for owls, including recent
4  wildfires in protected activity centers ("PACs") and drought
5  related mortality); SNFPA 3608 (new information on owl
6  demographics "did not drive the development of new management
7  direction but was used to inform the decision-maker of the
8  effects of implementing the new proposal").  Additionally, the
9  Management Review Team acknowledged that "because of the
10 considerable uncertainty about the knowledge of owl demographics,
11 it "does not believe or suggest that this new information will
12 eliminate concern for the status and trend in owl population[s]"
13 SNFPA 1950, 3214, 3607, 3608, 3340.  Instead, the Team
14 acknowledged that all available science indicates that owl
15 habitat "must be carefully managed." SNFPA 1950.  It did not
16 assume that owl populations were actually increasing (SNFPA
17 0266), and it acknowledged that reproductive success in any given
18 year cannot be used to indicate overall population trends due to
19 periodic breeding pulses.  SNFPA 3214.

20    Given new conclusions reached by the meta-analysis and the
21 recognition by the Team that the owl still merits protection (the
22 2004 Framework's "hard look" at its effects upon the owl will be
23 more extensively considered later in this Court's discussion of
24 the NEPA violations identified by Plaintiff), we cannot say the
25 2004 Framework's new management direction towards the owl was
26 arbitrary and capricious.

27 ///

28 ///

26

It is also important to consider that, in the long run, the 2004
Framework estimates that its implementation will reduce by some
22 percent the number of acres burned each year by wildland fire,
an event which causes "[l]oss and degradation of habitat,
creation of habitat gaps, and lengthy time period for habitat
reestablishment."  SNFPA 3347.  Moreover, in the short run,
immediate effects to owl habitat have been demonstrated by
several large, recent wildfires.  SNFPA 3215.  Given the observed
loss to owl PACs and other habitat areas, it was reasonable for
the 2004 SEIS to have concluded that owl "habitat would benefit"
from the decreased risk of stand-replacing fire under the 2004
Framework.  SNFPA 3349; see SNFPA 3287, 3288 (showing reductions
in wildland fire under 2004 Framework); SNFPA 3348 (a "potential
subsequent decreased loss of spotted owl habitat to wildfire is
expected" under the 2004 Framework).

    The Court believes that the 2004 Framework was motivated by
a fundamental exercise of the agency's discretion to strike a
different multiple use balance which, while still protective of
owls, places a greater emphasis on more effective reduction of
hazardous fuels so as to decrease the risk of stand-replacing
wildfire.  See SNFPA 2995, 3626; see also Native Ecosystems
Council v. Forest Serv., 428 F.3d 1233 (9th Cir. 2005) ("The
long-term benefit of preventing stand-replacing fires, which
completely destroy goshawk habitat, is preferable over any short-
term benefit the goshawks might receive from retaining the dense
forest structure in the project area.... Consequently, we uphold
the agency action under the APA's arbitrary and capricious
standard.");

Northwest Motorcycle Ass'n v. Dep't of Agric., 18 F.3d 1468, 1479
(9th Cir. 1994) (Forest Service's "desire to provide a proper
balance of trail opportunities between motorized and non-
motorized users and to reduce 'user conflict'" was reasoned basis
for closure to off-road vehicles).  In advocating a new
management direction for the owl, the Forest Service's action was
not devoid of any reasoned analysis so as to violate the
provisions of the APA.

### C.  Grazing Impacts

In enacting changes to grazing opportunities available under
the 2004 Framework, Plaintiff also argues that no changed
circumstances were present to justify any change from the grazing
direction mandated by the 2001 Framework.  According to
Plaintiff, the Forest Service was aware at the time it enacted
the 2001 Framework that it was reducing opportunities for grazing
on national forest lands.  In changing the standards for
permissible grazing under the 2004 Framework, Plaintiff contends
that absent altered circumstances and a corresponding "reasoned
analysis", the Forest Service's actions contravened the mandate
of the APA.  Specifically, in comparing the effects of the 2004
and 2001 Frameworks, Plaintiff focuses on the justification for
grazing restrictions posed by adverse impacts on the willow
flycatcher and the Yosemite toad, two species dependent on the
kind of habitat where grazing occurs.

///

///

1    The 2004 Framework makes it clear, however, that the full
2  impact upon grazing of the 2001 Framework was not made clear
3  until after its enactment.  The 2004 SEIS points out that grazing
4  effects were considered only "in very general terms" in 2001,
5  with information at that time still lacking about the
6  distribution of occupied habitat for species like the Yosemite
7  toad.  SNFPA 3392.  Critical survey information for the willow
8  flycatcher was also absent.  Id.  That dearth of information had
9  been corrected by the time the 2004 Framework was adopted.  See
10 id. ("Much of the field survey work has since been done and this
11 new information provides a better foundation from which to
12 evaluate effects.").

13    After collecting additional survey data, the Management
14 Review Team found that at least two grazing allotments would go
15 to non-use based on a restriction to late season grazing at
16 unoccupied sites.  SEIS __01_00063-65.[9]  The Team also found that
17 the 2001 ROD actually provided a disincentive for grazing
18 permitees to facilitate species recovery.  Grazing permittees,
19 for example, had worked with the Forest Service to develop
20 protections for nesting willow flycatchers in certain areas with
21 concentrated flycatcher territories.  Those affirmative
22 protections had ceased with adoption of the 2001 Framework with
23 only a passive meadow closure and non-use mandates in effect.
24 Id.

25 ///

26 ─────────────────

27    [9] This designation refers to materials contained on CDs
   within the administrative record, with the first designation
28 referring to the CD volume and the second designation the bates-
   stamped number on the bottom of the cited page.

1    Under the 2004 Framework, on the other hand, change was
2  initiated that improved the ability to develop site-specific
3  plans tailored to address conservation at a local level while
4  still permitting grazing.  While 2004 ROD still requires surveys
5  and protections for occupied sites, it permits grazing on
6  occupied sites where the Agency has developed a site-specific
7  management strategy.  SNFPA 3048.  That strategy focuses on
8  "protecting the nest site and associated habitat during the
9  breeding season and the long-term sustainability of suitable
10 habitat at breeding sites."  Id.  This comports with the Review
11 Team's observation that impacts from grazing (such as flycatcher
12 nest bumping) could be addressed by working with permittees to
13 adjust the timing, location, and intensity of grazing to keep
14 livestock out of willow flycatcher territories during the bird's
15 breeding period.  SEIS_01_00067.

16    Similarly, for the toad, the 2004 Framework excludes grazing
17 from occupied habitat except where an interdisciplinary team has
18 developed a site-specific plan to successfully manage livestock
19 around those areas.  SNFPA 3001.

20    The 2004 Framework candidly acknowledges that over half of
21 the 124 known willow flycatcher sites are in or near active
22 grazing allotments, making contact between livestock and
23 flycatchers likely.  SNFPA 3221.  The 2004 Framework further
24 recognizes data suggesting that population trends for the willow
25 flycatcher in the north-central Sierra Nevada are not
26 encouraging.  SNFPA 3322.
27 ///
28 ///

1   Nonetheless, by allowing site-specific plans that permit grazing
2   during periods not apt to significantly impact either the
3   flycatcher or the toad, and thereby increasing the use of certain
4   allotments, the Forest Service's actions are neither arbitrary or
5   capricious for purposes of the APA.   This decision to strike a
6   different multiple use balancing between habitat protection and
7   grazing is supported by the record, and amounts to a reasonable
8   exercise of the Forest Service's discretion, as articulated
9   above, to emphasize a different mix of the resources it is
10  entrusted to manage.

11       In addition, with regard to grazing, it must be pointed out
12  that the 2004 Framework does not eliminate environmental
13  protections.   The Framework retains numerous components of the
14  2001 ROD that are important to the protection of riparian and
15  aquatic habitat.   See SNFPA 3000 (2004 ROD retains "Critical
16  Aquatic Refuges, the Riparian Conservation Areas, and the goals
17  of the Aquatic Management Strategy ["AMS"]").   The 2004 ROD also
18  built upon two years of field surveys for the Yosemite toad and
19  willow flycatcher, as well as a conservation assessment for the
20  flycatcher, by requiring an interagency conservation strategy for
21  the flycatcher that will incorporate input from the State of
22  California and the United States Fish and Wildlife Service
23  ("FWS").   Id.
24  ///
25  ///
26  ///
27  ///
28  ///

31

1    In sum, whether looking at the 2004 Framework's treatment of
2  fuels and fire, its protection to wildlife, or the balance struck
3  between competing interests like grazing and community
4  protection, the Forest Service had the policy discretion to
5  change the Framework to provide more or less emphasis to any
6  given resource or interest, so long as essential protections were
7  afforded.  In managing forests, every decision involves tradeoffs
8  among competing use values and the competing interests of
9  different species.  Sierra Club v. Espy, 38 F.3d 792, 800-02 (5th
10 Cir. 1994).  The policy values the Forest Service emphasized to a
11 greater extent in the 2004 Framework were not arbitrary or
12 capricious so as to violate the APA.  Those policy choices are
13 within the Forest Service's "wide discretion to weigh and decide
14 proper" multiple uses under the NFMA and the MUSYA.  Big Hole
15 Ranchers Ass'n v. U.S. Forest Serv., 686 F. Supp. 256, 264 (D.
16 Mont. 1988).

17

18 **III. CLAIMS UNDER NEPA THAT THE FOREST SERVICE FAILED TO TAKE THE**
   **REQUIRED "HARD LOOK" PRIOR TO ADOPTING THE 2004 FRAMEWORK**
19

20   The remainder of Plaintiff's claims as set forth in the
21 First Amended Complaint are predicated on violations of NEPA
22 despite the fact that they also invoke the APA, given the fact
23 that as a procedural matter alleged violations of the APA must be
24 made within the waiver of sovereign immunity contained within the
25 APA.  Earth Island, 351 F.3d at 1300.
26 ///
27 ///
28 ///

1    As indicated above, NEPA only requires that federal agencies
2    like the Forest Service establish a consistent process for
3    considering environmental impacts, and take a "hard look" at the
4    consequences of such impacts.  <u>Vermont Yankee Nuclear Power v.</u>
5    <u>NRDC</u>, 435 U.S. 519, 558 (1978).  So long as "the adverse
6    environmental effects of the proposed action are adequately
7    identified and evaluated, the agency is not constrained by NEPA
8    from deciding that other values outweigh the environmental
9    costs."  <u>Id</u>.

10    While NEPA requires an evaluation of environmental effects,
11    it imposes no substantive constraints on the Agency's decision
12    making.  <u>Methow Valley</u>, 490 U.S. at 350; <u>Salmon River Concerned</u>
13    <u>Citizens v. Robertson</u>, 32 F.3d 1346, 1356 (9th Cir. 1994) NEPA
14    "does not dictate a substantive environmental result").  NEPA
15    even presumes that agencies will have a preferred action,
16    requiring only that impacts be evaluated objectively and in good
17    faith.  <u>See</u> 40 C.F.R. § 1502.14(3) (requiring identification of
18    agency's preferred alternative); <u>Metcalf v. Daley</u>, 214 F.3d 1135,
19    1142 (9th Cir. 2001) ("NEPA assumes as inevitable an
20    institutional bias within an agency proposing a project....").

21    Judicial review under NEPA cannot extend to the substantive
22    need for, or desirability of, a particular policy like increased
23    protection against wildfires or heightened protection for
24    wildlife.  <u>See</u> <u>Mobil Oil Expl. & Prod. Southeast, Inc. v. United</u>
25    <u>Dist. Cos.</u>, 498 U.S. 211, 230-31 (1991); <u>Vermont Yankee Nucl.</u>
26    <u>Power Corp. v. Natural Res. Def. Council</u>, 435 U.S. 519, 541-48
27    (1978); <u>Personal Watercraft Ass'n v. Dept. of Commerce</u>, 48 F.3d
28    540, 544-56 (D.C. Cir. 1995).

The Constitution reserves such policy decisions for assessment and determination by the Executive and Legislative branches of government.

Here, Plaintiff nonetheless asserts that the Forest Service violated the procedural protections afforded by NEPA by unreasonably highlighting and quantifying reductions in wildfire and increased economic benefits to timber and grazing interests but failing to address in a similar fashion the risk of irreparable harm to the diversity and viability of unique species and the long-term sustainability of their associated ecosystems. Plaintiff claims that Defendants have accordingly not taken the requisite "hard look" at the consequences of their proposed action.  The State further asserts that the Forest Service failed to disclose and substantively address the pointed and detailed criticisms lodged by virtually every expert resource agency and scientific working group.  Finally, the State claims that by failing to consider a reasonable range of alternatives to implementation of the 2004 Framework, the Forest Service also violated NEPA.  We turn now to each of the alleged shortcomings identified by Plaintiff as constituting NEPA violations.

///

///

///

///

///

///

///

///

1     **A.   Timber Harvesting**

2

3          Pointing to the fact that timber harvesting under the 2004

4     Framework is projected to increase some 4.7 fold over projected

5     2001 levels in the first decade, largely because of the slated

6     full implementation of the HFQLG Act (SNFPA 3389 (Table 4.4.1b)),

7     Plaintiff argues that the Forest Service has not attempted to

8     state with any degree of confidence that in the short-term, the

9     level of fuel treatment contemplated by the 2004 Framework would

10    not adversely affect old forest habitats.  According to

11    Plaintiff, the 2004 Framework contains only very general

12    discussions of the potential adverse impacts caused by timber

13    harvesting under the 2004 Framework.

14         The Forest Service, on the other hand, claims that the

15    potential effects from logging activities are considered

16    throughout the Framework documentation for individual resources.

17    See, e.g., SNFPA 3271, 3272-75 (forest vegetation); 3280-84

18    (aquatic resources); 3289-91, 3296-97 (fire and fuels); 3298

19    (noxious weeds).  On a more fundamental level, however, the

20    Forest Service correctly points out that the 2004 Framework as a

21    programmatic document does not authorize any actual timber

22    harvest; rather, it establishes only the standards and guidelines

23    under which future projects that authorize harvest would occur.

24    See Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726

25    (1998); SNFPA 3014 (amended plans "do not provide final

26    authorization for any activity").

27    ///

28    ///

35

Future site-specific authorization of actual timber harvest would
have to comply with NEPA, where effects would be analyzed in more
detail according to site-specific factors.  See SNFPA 3010, 3690,
4019.

California's attempt to target the specifics of the 2004
Framework's approach to timber management suffers, then, from the
fundamental error that the 2004 Framework does not commit to
timber harvesting at specific locations and with particular
environmental constraints.  Such subjects will be addressed in
later site-specific NEPA documents before timber harvesting can
be commenced.  NEPA does not require the extensive detail the
state advocates in the 2004 Framework, as a programmatic first
level SEIS.

Even California agrees that the same level of analysis
appropriate to a site-specific plan does not apply to the 2004
Framework.  (Pl.'s Opp. to Defs.' Mot., 17:14-15).  The 2004
Framework only establishes the standards and guidelines under
which future projects that authorize harvest would occur.  With
regard to some resources, The effects of timber harvest are
simply too site-specific to be meaningfully analyzed at the
regional scale of the 2004 Framework.  Impacts stemming from the
delivery of coarse woody debris ("CWD") to streams following
logging, for example, which is important for stabilizing stream
channels and furnishing cover for fish, "is difficult at the
bioregional scale due to the extreme variability in the condition
of [riparian conservation areas] and the relative importance of
CWD in maintaining stream channel structure and function."  SNFPA
3282.

36

1  Such effects are more meaningfully evaluated in landscape and
2  project-level analyses using individual watershed and site-
3  specific parameters such as "stream width, tree heights,
4  distances from streams, slope steepness", and other factors.  Id.
5  In addition, hydrological effects from timber harvesting are
6  subject to further evaluation and appropriate mitigation on a
7  future project basis.  SNFPA 328.

8       Importantly, the 2004 Framework itself recognizes that where
9  timber harvesting effects are too variable or site-specific to
10  lend themselves to detailed, quantitative analysis at the
11  bioregional scale, individual effects are nonetheless subject to
12  scrutiny on a project-by-project basis.  See SNFPA 3010, 3690,
13  4019 (noting that future decisions to authorize timber harvest
14  would have to comply with NEPA).

15      With respect to the volume of timber harvest contemplated
16  under the 2004 Framework, as indicated above much of the planned
17  increase stemmed in the short-term from full implementation of
18  the HFQLG Act Pilot Project.  SNFPA 03387.  Despite Plaintiff's
19  contention to the contrary, the 2004 SEIS does address the
20  impacts of increased timber thinning and harvesting under the QLG
21  Pilot Project on old forest ecosystems, and on fire and fuels and
22  forest health.  See SNFPA 3166-3178, 3264-3392.  Moreover, in
23  wishing to fully enact the Pilot Project, the Forest Service had
24  two main objectives: 1) to obtain information on the effects of
25  small-area group harvesting of trees on species and fire
26  frequencies for purposes of providing better data on adaptive
27  management than was available under the 2001 Framework (see SNFPA
28  3139-3143); and

1  2) to provide American forest products for American consumers, as
2  well as to continue viable timber employment and needed tax base
3  to affected communities.  See SNFPA 3001-02, 3101; see also SNFPA
4  3121, 3131-34, 3166-78, 3264-3392.

5      Also critical in assessing the propriety of fully enacting
6  the Pilot Project is the fact that the HFQLG Act, which
7  authorized the Project, was congressionally mandated.   The
8  Forest Service was required by statute to conduct the Pilot
9  Project.  See 16 U.S.C. §2104 note, sec. 401(b).  Importantly,
10 too, the Forest Service already prepared a programmatic EIS in
11 August 1999 specifically for the Pilot Project, as well as a
12 supplemental programmatic EIS which was published in July 2003 in
13 response to a court order.  SNFPA 986.  The 2004 SEIS represents
14 yet another programmatic EIS that addresses standards and
15 guidelines for the Pilot Project.

16     The 2004 SEIS nonetheless contains an adequate discussion of
17 the effects of full implementation of the Project.  See SNFPA
18 3131-34 (description of management direction); 3177 (effects to
19 roads); 3267-68 (old forest connectivity); 3268-69 (old forest
20 desired conditions); 3270-71 (forest density/composition); 3275,
21 3276 (reforestation/regeneration); 3280, 3281, 3282 (aquatic
22 ecosystems); 3289, 3290, 3291, 3292, 3294, 3295 (fire and fuels);
23 3307 (red-legged frog); 3338-39, 3342 3361 (willow flycatcher);
24 3364 (great gray owl); 3373 (Yosemite toad "does not occur within
25 ghe HFQLG Pilot Project Area.").
26 ///
27 ///
28 ///

1    Plaintiff's argument that potential impacts have not been
2    evaluated is misplaced.  The prior Pilot Project EIS covers much
3    of the ground that Plaintiff would like to see re-analyzed in the
4    SEIS.  See SNFPA 3609 ("The environmental effects of the Pilot
5    Project were originally evaluated and analyzed in the HFQLG
6    FEIS"); SNFPA 3361 ("The effects of implementing the [Scientific
7    Analysis Team ("SAT")] guidelines have been analyzed and
8    discussed in the HFQLG FEIS and biological evaluation, and the
9    effects of implementing the SAT guidelines in lieu of the AMS
10   have been evaluated and discussed in the SNFPA FEIS and
11   biological evaluation.").  As the Forest Service points out, NEPA
12   is not an exercise in generating paperwork, but rather is aimed
13   at producing meaningful analysis.  See 40 CFR 1500.4, 1500.1(c),
14   1502.1.  It was therefore reasonable for the SEIS to include an
15   analysis only of new standards and guidelines pertaining to the
16   Pilot Project and not a full-blown re-evaluation as Plaintiff
17   advocates.

18   Significantly, too, the SEIS adequately reconciles its prior
19   conclusion in the Pilot Project BA/BE that full implementation
20   might threaten owl viability.  See SNFPA 3338-39, 3608-09; see
21   also SNFPA 1968.  As already mentioned above and as further
22   discussed in the next section of this Memorandum and Order, the
23   prior owl viability analysis was reviewed and found to have
24   unnecessarily taken a "worst case approach to estimating effects"
25   on the owl, while the actual implementation was believed to
26   encompass more modest impacts.  SNFPA 1968; see SNFPA 3338, 3609.
27   ///
28   ///

39

In sum, because the 2004 Framework's discussion of impacts from timber harvesting is both adequate for purposes of a programmatic documents and sufficient for purposes of addressing implementation of the HFQLG Act Pilot Project under the circumstances, the requirements of NEPA have been satisfied.

**B.  Effects to Wildlife Species**

As indicated above, Plaintiff's lawsuit challenging the 2004 Framework, to the extent it focuses on wildlife allegedly impacted by implementation of the Framework, analyzes such impacts on three particular species: the California spotted owl, the willow flycatcher and the Yosemite toad.  Having already analyzed whether there was any "reasoned analysis" supporting the difference between the protections afforded the species under the 2004 as opposed to the 2001 Framework, we now look to whether, for purposes of compliance with NEPA, the 2004 Framework took the requisite "hard look" at impacts to the three species.

**1.  California spotted owl**

In analyzing whether the Forest Service was deficient in analyzing impacts to the owl, a species preferring old-growth forest conditions, it is important to initially consider the extent to which the 2004 Framework is expected to impact old-growth habitat.  The record discloses that any such effect appears minimal.  No treatments under the Framework are projected for some 86 percent of Old Forest Emphasis Area ("OFEA").

SNFPA 3332.  Treatment in Protected Activity Centers ("PACs"),
which, as indicated above, comprise 300-acre parcels around each
known owl nest or roosting site, are very limited throughout the
Framework area[10] and virtually nonexistent in the HFQLG area
where most of the logging is scheduled to take place.  SNFPA
2997; 3121-3122; 3336.  Moreover, no treatment of any kind will
occur within 80 percent of the 1,000 acre Home Range Core Areas
("HRCAs") set aside in conjunction with each PAC, and to the
limited extent such treatments occur they are permitted only
outside a 500-acre radius surrounding the PAC.  Id., see also
SNFPA 3334.  Even outside of HRCAs and PACs, the more intensive
vegetation treatments under the 2004 Framework are likely to
reduce canopy cover to 40 percent on only 8 percent of acres
treated currently at 50 percent canopy cover or greater.  SNFPA
3344.  Treated areas will retain landscape features recognized as
being important to old-forest dependent species, like larger
trees (in excess of 30 inches in diameter), snags, and 40 percent
plus canopy.  SNFPA 2995; 2997; 3341.

///

///

///

///

---

[10] Under the 2004 Framework, the maximum of PAC acres that
could be affected is 5 percent per year and 10 percent per
decade.  SNFPA 3334.  Only 4 percent of PAC acres under 2004
Framework would be treated within 26 percent of existing PACs.
SNFPA 3350.  All known owl nesting sites would be protected and
PACS would be established for newly discovered sites.  SNFPA
3334.  With respect to the 1,321 existing PACS established
through 2002, they would be retained and treatment avoided to the
extent possible.  SNFPA 2997; 3121-3122; 3336.

1    Finally, in comparing the 2001 and 2004 Frameworks, there is
2    a negligible difference in the short run between 2001 and 2004
3    Frameworks as to the available acres of late seral stage forest,
4    with an overall increase in the long term (60 plus years).  SNFPA
5    3327.

6    On the basis of the quantified habitat impact disclosed by
7    the 2004 Framework, then, the effect of the 2004 Framework on
8    old-forest species like the owl appears negligible.  Plaintiffs
9    nonetheless claim that the short-term effects upon the owl have
10   not adequately been disclosed for purposes of NEPA.

11   Any consideration of the effects of vegetation treatments in
12   the Sierra Nevada necessarily involves a difficult balancing act
13   between the short-term risk that some old-growth species may be
14   displaced by any habitat disturbance, and the longer term risk
15   that without reducing forest density through thinning and logging
16   operations, stand-replacing wildfires may eliminate suitable
17   habitat in its entirety.  The 2004 Framework specifically
18   recognizes that it is a very difficult task to find the best way
19   to protect old forest dependant species and to increase and
20   perpetuate old forest ecosystems, while at the same time
21   addressing the desperate need for forest intervention to reduce
22   the risk of fuel loads feeding catastrophic fires.  SNFPA 2995.
23   A thinning program to reduce the risk of catastrophic wildfire
24   will reduce the likelihood of stand-replacing fires in old growth
25   areas in the future.  SNFPA 2995, 3083; 3266, 3336.
26   ///
27   ///
28   ///

1    Significantly, as the 2004 Framework also recognizes, recent

2    fire seasons illustrate the risks from inaction as the number and

3    severity of acres burned in wildfires continues to increase, with

4    tragic losses to communities, their people and resources, as well

5    as to wildland firefighters.  Moreover, to the extent that

6    forests are overstocked and drought conditions are present, an

7    overall lack of sufficient moisture makes forest drier and not

8    only more susceptible to fire but also prone to insect and

9    disease damage.  SNFPA 2996.  The Forest Service has the

10   unenviable task of attempting to simultaneously weigh these

11   significant competing considerations with the risks, both long

12   and short-term, to old-forest species like the owl, fisher and

13   marten.

14       Despite Plaintiffs' claim that the 2004 Framework fails to

15   provide enough analysis of its likely impacts to wildlife,

16   especially in short run, the SEIS does recognize the importance

17   of addressing short-term impacts.  The importance of

18   consideration short-term impacts on the owl is specifically

19   recognized.  See SNFPA 3327, 3337 ("With regard to owl population

20   persistence, the short-term effects of management activities are

21   believed to be most relevant.... and are highlighted in this

22   effects analysis."), see also SNFPA 3339-3345.  The 2004

23   Framework additionally recognizes that logging treatments "over

24   the short-term (20 years) may introduce some unknown level of

25   risk to the California spotted owl population."  SNFPA 3340.

26   ///

27   ///

28   ///

1    The 2004 Framework nonetheless attempts to mitigate that

2 risk, while at the same time meeting not only the long term

3 objective of long-term habitat preservation through the reduced

4 risk of stand-replacing fire, but also the other multi-use

5 considerations enumerated above.  Although uncertainty remains

6 concerning rangewide population trends, there is no definitive

7 evidence that overall owl populations are decreasing across the

8 Sierra Nevada.  SNFPA 3214.[11]  The 2003 meta-analysis conducted

9 by spotted owl biologists, which includes the only demographic

10 studies of owl population trends, survival and reproduction over

11 the previous 7 to 12 years, recommends adaptive management

12 experiments to evaluate the effects on the owl of silvicultural

13 treatments designed to reduce fire risk.  SNFPA 3152.  Adaptive

14 management strategies are "intended to improve scientific

15 knowledge regarding the fire and fuels strategy as well as

16 habitat relationships and vegetation management effects on

17 California spotted owls."  SNFPA 3608.  Adaptive management

18 encourages scientific scrutiny so that elements of the plan can

19 be adjusted to "better balance management of the California

20 spotted owl with management for other resources and activities.

21 Id.

22 ///

23 ///

24

25    [11] In addition, the FWS concluded from an analysis conducted
   by both the FWS and the Forest Service that "there was no clear
26 statistical evidence to show that the [California spotted] owl
   was decreasing across its range."  SNFPA 3995.  Based on both the
27 2004 SEIS and its accompanying BE the Forest Service concluded
   that while the 2004 Framework decision "may affect individuals,
28 but [is] not likely to trend toward Federal listing."  SNFPA at
   3946.

The 2004 Framework does adopt adaptive management strategies, which permit the Forest Service to respond to any short-term impacts as they are ascertained.  The California Spotted Owl Response Module, for example, is designed to provide information on treatment effects at both the individual site and population level scales in addressing numerous issues, including population density, trends, habitat suitability, reproduction and survival using radio telemetry and sampling techniques.  SNFPA 3155.  The 2004 Framework indicates that funds have been provided to execute a total of five modules that comprise this integrated research project, which significantly includes examination of effects not only to the owl but also on small mammal habitat associations (like the Pacific fisher and American marten) and vegetation response to fuel treatments in general.  Id.

In addition to using adaptive management strategies as a way of managing short-term impacts, the 2004 Framework also utilizes modeling projections to aid in a thorough assessment of such impacts.  Modeling results prior to year 20 were disclosed.  See SNFPA 3287, 3288, 3327.  Also, a comparative analysis was conducted on late-seral stage forest in the short-term, including years 0 through 20.  SNFPA 3326-3327.  Through such projections, the Forest Service predicted that the amount of old forest is projected to increase across the bioregion in the short-term, "despite treatments in approximately 14 percent of old forest emphasis areas."   SNFPA 2996, 3602.

///

///

///

1    In the long term, reliance upon modeling is a sound
2  methodology deserving deference.  <u>See</u> <u>Salmon River</u>, 32 F.3d at
3  1359 (courts should not resolve disagreements among scientists as
4  to methodology).  Long term projections are "fundamental to
5  forestry science."  SNFPA 3337.  The models for the SEIS are
6  "state-of-the-art" updated versions of those used in the
7  Northwest Forest Plan and "every other national forest plan in
8  the Region."  <u>Id</u>.  (Models are "based on thousands of measured
9  trees, are grounded in forestry science and are uniquely
10 developed to cover the major forested areas around the country").
11 The SEIS also fully disclosed the models' assumptions.  <u>See</u> SNFPA
12 3461-3480.  Plaintiff cannot show that long-term modeling is an
13 unreasonable methodology.  <u>See</u> <u>Salmon River</u>, 32 F.3d at 1359;
14 <u>Nevada Land Action Ass'n v. Forest Serv</u>., 8 F.3d 713, 718
15 (approving use of models in forest planning).  Significantly, the
16 Ninth Circuit recently reaffirmed that modeling is a legitimate
17 projection tool where supported by a reasonable scientific basis.
18 <u>See</u> <u>Lands Council v. McNair</u>, 2008 WL 2640001 at *8 (9th Cir.
19 2008).

20    While the Forest Service's use of modeling projections to
21 predict both short and long term impacts is criticized by
22 Plaintiffs as unreliable, in fact the 2004 Framework includes an
23 appendix that discloses potential errors in modeling projections.
24 SNFPA 3649-50.
25 ///
26 ///
27 ///
28 ///

1    Importantly, the Forest Service acknowledged uncertainty in

2 whether owl populations are in fact stable (see SNFPA 3213-3214)

3 by adopting guidelines still protective to the owl-- retaining

4 large live conifers, retaining 40 percent of basal area of

5 largest trees in mature forest outside defense zones, providing

6 large-snag retention guidelines, and minimizing impacts to owl

7 PACs.  SNFPA 3040-41, 3041-42, 3049-51.

8    The Forest Service's decision to proceed forward with

9 vegetation management even in the face of some short-term

10 uncertainty as to owl impacts also must be viewed in conjunction

11 of the very real short-term risk occasioned by habitat loss due

12 to wildfire.  According to the 2004 Framework, an annual average

13 of 2.5 PACS a year have been lost or severely modified by

14 wildfire since 1998.  SNFPA 3336, 3349.  Over the last four

15 years, however, the annual loss has increased to 4.5 PACS.  Id.

16 Immediate effects to owl habitat have been documented for several

17 large wildfires (Buck, Storrie, Manter, McNally, Star, and Gap)

18 between 1998 and 2002.  SNFPA 3215.  Although the magnitude of

19 the full effects to owl habitat will not be understood for many

20 years, most of these fires "did lead to total or partial loss of

21 PACs," based upon the extent of mortality of mature conifers

22 immediately following the fire.  Id.  Under the 2004 Framework,

23 not only would there be fewer acres burned by wildfire, but "a

24 reduction in the fraction of wildfire acreage (forested) that is

25 lethally burned" is also projected.  SNFPA 3287-88.   The

26 mechanical thinning planned under the 2004 Framework is expected

27 to reduce rate at which habitat within PACs and SOHAs is lost to

28 wildfire.  SNFPA 3336, 3349.

47

1    The 2004 Framework also addresses specific areas of concern
2 identified by owl scientists as representing potential areas
3 where future problems would be greatest if owl's status in Sierra
4 Nevada were to deteriorate.  SNFPA 3341.  Despite the cumulative
5 benefits of reducing devastating wildfire as discussed above, the
6 2004 Framework nonetheless recognizes that the management
7 prescriptions adopted by the 2004 Framework do risk the reduction
8 of owls and owl habitat in some areas of concern.  SNFPA 3342.
9 This also constitutes a recognition of short-term impacts.

10   Significantly, too, in terms of short-term impact, the
11 record also contains Lee and Irwin's article on assessing risks
12 to spotted owls from forest thinning, which recognizes that
13 "modest fuels treatments are compatible with territory-level
14 canopy cover needs for spotted owl reproduction in the Sierra
15 Nevada." See SNFPA 2654.

16   Additionally, in terms of acreage, over the last 30 years
17 wildfire in the Sierra Nevada has burned an average of about
18 43,000 acres per year, whereas in the last ten years, that
19 average has risen to about 63,000 acres per year.  SNFPA 3083.
20 Projections comparing the anticipated effects of the 2001
21 Framework versus its 2004 successor show a decrease from 63,000
22 acres to 60,000 during the first decade.  That figure decreases
23 to 49,000 acres in the fifth decade, with implementation of the
24 2004 Framework estimated as accounting for a 22 percent decrease
25 in the acreage lost due to wildfire as opposed to only 2 percent
26 with the 2001 version.  Id.

27 ///
28 ///

48

1  To the extent that the hypothesized trend of increasingly large,
2  high severity wildfires is correct, the rate of loss of PACs
3  would be expected to mirror this increase.  That suggests a
4  severe short-term risk.

5      According to the 2004 Framework, any short-term decreases in
6  certain owl habitat are counterbalanced by longer term cumulative
7  increases in all suitable habitat types.  SNFPA 3336.  Moreover,
8  because of the risk of negatively affected CASPOs in the short-
9  term by mechanical treatments, the line officers are directed to
10 proceed with extreme caution when proposing and vegetation
11 management within PACs and to attempt to avoid such treatment
12 wherever possible.  SNFPA 3350.

13      Additionally, examination of the Framework shows that more
14 emphasis of short-term effects was added to the FEIS in response
15 to public comments.  As the Forest Service stated, "the FEIS
16 discusses short-term impacts of the Alternatives on CASPOs and
17 considered the tradeoffs of treatments to protect and enhance
18 long-term sustainability of resources, species viability, and
19 impacts on multiple resources.  It is the responsibility of the
20 Responsible Official to weigh this information and select the
21 alternative that best balances risk, uncertainty, effects to
22 resources, and public welfare and safety."  SNFPA 3517.  The SEIS
23 recognizes that there is continuing scientific uncertainty
24 regarding habitat relationships and population trends of the
25 California spotted owls.  The SEIS also recognizes that there is
26 considerable concern for the long-term habitat loss and
27 fragmentation caused by large high severity wildfires."  SNFPA
28 3606.

1    In sum, Plaintiffs' arguments that the SEIS does not
2    adequately consider short-term effects upon old forest species
3    like the owl reflect a desire to see a level of detail that is
4    not expected for a programmatic EIS, and a level of certainty
5    that is not required by NEPA.  The Ninth Circuit's decision in
6    Ecology Center, Inc. v. Austin, 430 F.3d 1057 (9th Cir. 2004),
7    relied upon by Plaintiff, involved a project decision, not a
8    programmatic decision, which requires less detailed analysis.
9    See Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346,
10   1357-58 (9th Cir. 1994).[12]  Moreover, while Plaintiff urges the
11   Court to overturn the 2004 Framework with respect to the
12   protections it affords to the owl, Plaintiff's argument is
13   premised on a substantive "risk-benefit" analysis that cannot be
14   squared with the procedural safeguards mandated by NEPA.
15   Defendants are entitled to judgment in their favor to the extent
16   that Plaintiff's complaint alleges that the 2004 Framework failed
17   to adequately consider its direct and indirect impacts to old-
18   forest species like the owl.
19   ///
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///
26
27       [12] Moreover, and in any event, the Ecology Center decision
28   was recently overruled by the Ninth Circuit in Lands Council v.
     McNair, 2008 WL 2640001 at *6-10 (9th Cir. 2008).

## 2.  Willow flycatcher

With regard to the willow flycatcher, the main difference between the 2001 and 2004 Frameworks with the fact that under the 2004 Framework, managers at grazing sites occupied by the flycatcher have the option either to restrict grazing to late season, or to allow grazing year-round under a site-specific management plan.  SNFPA 3359.  The SEIS carefully explains that only about ten percent of nesting attempts for flycatcher occur after August 15th, the date for commencement of late season grazing, often because of unusually wet weather conditions.  Id. The 2004 Framework contemplates that should such late nesting be identified, the date when livestock are allowed onto grazing allotments would likely be delayed, thereby "moderating the risk" of nest disturbance.  Id.  The SEIS further requires a site specific plan to protect flycatcher habitat during the breeding season and to maintain long-term habitat suitability for the bird.

In taking issue with this approach, Plaintiff points to the findings of the Willow Flycatcher Working Group ("WFWG"), a panel comprised of experts on the ecology of the flycatcher that periodically discuss the status of the species in the Sierra and devise strategies for its recovery.  The WFWG felt that implementation of the 2004 Framework carried a high probability of promoting a continued decline in the abundance of the willow flycatcher population (see SEIS_02_01969).  In addition, the California Department of Fish and Game expressed similar sentiments.  SNFPA 3903.

51

1  Given these findings, Plaintiff argues that the magnitude of the

2  risk to the flycatcher has not been adequately discussed.

3  Plaintiff further argues that because the 2004 Framework focuses

4  only on currently occupied nesting sites (whereas its predecessor

5  also included sites that had been used in the past even if no

6  continuing activity was detected), actions to specifically

7  restore flycatcher habitat would less likely be taken.  SNFPA

8  3358.

9       Despite these protestations, the change with regard to

10 management of the willow flycatcher in the 2004 Framework appears

11 modest.  Permitting local flexibility in permitting grazing, so

12 long as willow habitat remains protected and active nesting areas

13 are excluded, is not suspect under NEPA.  Instead, as a

14 programmatic document, the 2004 Framework properly mandates that

15 site-specific management plans protect flycatcher habitat during

16 the breeding season.  If local conditions permit grazing to occur

17 while safeguarding such protections, grazing may properly occur.

18 If, on the other hand, the site-specific plan improperly allows

19 grazing that impinges on willow flycatcher viability, that is an

20 issue to be taken up at the site-specific level and not as part

21 of a NEPA challenge to the procedural measures taken in the 2004

22 Framework as a whole.

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

### 3.  Yosemite toad

Like the flycatcher, Yosemite toad habitat may also be affected by grazing in forest meadow areas.  Moreover, also like the flycatcher, the 2001 Framework required a blanket exclusion of livestock from all occupied toad sites during the breeding and rearing season.  Also akin to the flycatcher is the fact that the changes pertaining to management of the toad between the 2004 Framework and its 2001 predecessor are minimal.  For toads, the 2004 Framework affords local managers flexibility in allowing grazing pursuant to "site-specific management plans" that would be charged with ensuring management of livestock movement around wet areas suitable for toad habitat.  SNFPA 3372.  Significantly, the 2004 Framework requires that any such plans permitting grazing include "annual systematic monitoring of habitat conditions, toad occupancy, and population dynamics at sampling sites."  Id.  The 2004 Framework specifically defers management direction of grazing to the "project level" (Id.), and the Court believes that this is equally permissible under NEPA as for both the Yosemite toad and the willow flycatcher, as discussed above.

Significantly, too, the 2004 Framework did not avoid discussion of problematic factors affecting toad management, like the fact that because of difficulty in herding and fencing livestock in high elevation meadows, grazing and movement will take place in some portion of toad breeding and rearing areas if livestock are allowed in adjacent areas.  SNFPA 3372.  The Framework also acknowledges that little information exists about the effects of land management activities on the Yosemite toad.

53

SNFPA 3371.  It further summarizes the risk of trampling of some
egg masses and tadpoles, as well as the vulnerability of toad
metamorphs due to slow movement, with the highest threat in that
regard occurring between July and October.  SNFPA 3372-73.
Indirect effects are also disclosed, including the modification
of breeding and rearing pool structural features from livestock
hooves, reduced cover from trampling and matting of vegetation,
and potentially delayed metamorphosis and small metamorphs as a
result of contamination of pools by livestock.  Id.

Given its recognition of risks as well as its direction that
local flexibility in permitting grazing be annually monitored for
both toad occupancy and habitat conditions, the Court concludes
that the 2004 Framework took the requisite "hard look" at effects
upon the Yosemite toad.

### C. Failure to Adequately Consider Opposing Scientific Viewpoints and Acknowledge Scientific Uncertainty

Plaintiff argues that the Forest Service failed to properly
consider concerns voiced by various state and federal resource
agencies and expert groups, including the United States Fish and
Wildlife Service, California state resource agencies and owl and
willow flycatcher scientists, to the 2004 Framework.  According
to Plaintiff, the Forest Service did not adequately disclose the
extent of controversy in the text of the 2004 Framework.
formulating the 2004 Framework, and identify that alleged
shortcoming as yet another violation of NEPA.

///

///

1    With respect to the owl, Plaintiff claims that the Forest

2 Service did not address the substance of concerns raised by owl

3 biologist Dr. Jared Verner and others.  The record shows,

4 however, that Regional Forester Jack Blackwell conducted

5 extensive meetings with the owl scientists relied upon by

6 Plaintiffs in order to listen to their concerns.  SNFPA 2432.

7 Blackwell was informed at those meetings that owl distribution

8 and density in the Sierra Nevada had been stable for the last ten

9 years with no decline (SNFPA 2433) and that owl population "will

10 never exhibit large increases because it is already at carrying

11 capacity."  SNFPA 2439.  Nonetheless, in response to concerns

12 voiced concerning the 2004 Framework, Blackwell wanted to ensure

13 that the Framework was scientifically credible and accordingly

14 asked that a Scientific Consistency Review ("SCR") be undertaken

15 by an independent team of scientists to ensure the scientific

16 credibility of the Framework.  The results of the SCR were used

17 by the interdisciplinary team preparing the 2004 Framework in

18 order to improve its environmental analysis and acknowledge

19 scientific uncertainty and differing points of view.  SNFPA 2578-

20 89; 2590-2601; 3002.  Blackwell adopted the SCR's recommendation

21 that adaptive management be employed and noted that the Forest

22 Service has a long history of investing in monitoring data and

23 research activities, like the California spotted owl demographic

24 studies conducted for the past 15-20 years.  SNFPA 3002.

25 ///

26 ///

27 ///

28 ///

1   In addition to engaging in the SCR process and conducting

2   agency meetings with scientists as discussed above, examination

3   of the 2004 Framework also shows that it looked at the

4   demographic data on the owl collected and described in the 2003

5   Meta-Analysis (SNFPA 2086, 2089) and that published research was

6   divulged and assessed (SNFPA 2638-57).  The SEIS specifically

7   recognized scientific controversy regarding the owl[13], but at the

8   same time acknowledged concern for long-term habitat loss and

9   fragmentation caused by large high severity wildfires.  3606.

10  All this points to a conclusion that the Forest Service took a

11  hard look at impacts to the California spotted owl as required by

12  NEPA.

13  Contrary to Plaintiffs' contention, contrary scientific

14  opinion was disclosed.  The 2004 Framework specifically

15  recognizes owl biologist Jared Verner's 1992 conclusion that

16  given spotted owl preferences for old growth features like

17  significant canopy cover, large trees and snags, any activities

18  that would degrade or remove any of these habitat attributes are

19  believed to pose some level of risk to owl occupancy and

20  production.  SNFPA 3335.  The 2004 Framework goes on to

21  acknowledge uncertainty as to whether benefits of treating PACs

22  to reduce their susceptibility to wildfire will outweigh the

23  potential negative effects of the treatments on owl occupancy and

24  habitat quality.

25  ///

26

27      [13] See SNFPA 3340 ("There is conflicting science about the
28  effects of canopy cover reductions from fuels treatments on the
    California spotted owl."); see also SNFPA 3144.

1   Id.[14]   In addition, it explicitly recognizes conflicting science

2   about the effects on the spotted owl of canopy cover reduction

3   caused by fuel treatments, like Hunsaker's 2002 study showing

4   that owl productivity negatively correlated with a canopy cover

5   less than 50 percent.  SNFPA 3337.  The 2004 Framework goes on to

6   compare this analysis with a contrasting 2003 Lee and Irwin

7   article which found that concerns about proposed fuel treatments

8   having a negative effect on owls were not supported by either

9   their analysis or other published information.  SNFPA 3340.

10       While the Forest Service recognizes Lee and Irwin's research

11  finding that lethal fire simulations produced a pronounced and

12  lasting negative effect on the owl (SNFPA 2639), as indicated

13  above it also concludes that the pace and intensity of mechanical

14  thinning planned under the alternative chosen by the 2004

15  Framework is expected to reduce the rate at which habitat within

16  PACs and SOHAs is lost to wildfire.  SNFPA 3336.

17       In addition to disclosing the existence of opposing owl

18  science in citations contained within the SEIS, the Forest

19  Service also addressed scientific controversy in its responses to

20  numerous public comments engendered by the DSEIS.  See SNFPA

21  3600-3616.

22       The 2004 Framework recognizes that there is continuing

23  scientific uncertainty regarding habitat relationships and

24  population trends of the California spotted owls.  Scientific

25  uncertainty regarding the owl are discussed throughout the SEIS.

26  _____

27       [14] See also SNFPA 3342 (citing Blakesley & Noon's 1999 study
    for the notion that certain activities "would increase
28  uncertainties associated with successful dispersal and mate
    finding").

<u>See, e.g.,</u> SNFPA 3143-48.  Despite Plaintiff's contention to the contrary, scientific uncertainty about the effect of proposed fuel treatments on old-forest species, including the owl, is disclosed throughout the SEIS with specific literature references.  <u>See, e.g.,</u> SNFPA 3313, 3314, 3315 (including literature citations for research on the Pacific fisher); SNFPA 3337 (citing Self and Kerns, 2001 Kucera, 2000, Spencer, 1981, SNFPA 3325)) for the American marten); SNFPA 3337, 3340, 3342 (citations for the owl).

With regard to the willow flycatcher, Plaintiff's contention that the SEIS did not address comments by the flycatcher scientists also appears misplaced.  The Willow Flycatcher Working Group ("WFWG") made three main recommendations in response to the proposed 2004 Framework.  First, it advocated completion of a conservation strategy within 6-9 months.  Secondly, it recommended implementation of a monitoring and demographic study, and finally it advocated removal of livestock from occupied meadows on a year-round basis.  SEIS_02_001969-1970.  The Forest Service in fact adopted a variant of the first recommendation.  See SNFPA 3620 ("a conservation strategy for the willow flycatcher would be completed by May 2005").  Moreover, the second recommendation for a demographic study had already been addressed in an existing conservation assessment.  <u>Id</u>.; see also SNFPA 3359 (agency "will continue to direct study of the demographics of the willow flycatcher...."); SNFPA 3978 (showing prioritization of demographic study).  Lastly, the effects of year-round grazing were adequately analyzed in the SEIS.  <u>See</u> SNFPA 3359

1    The SEIS also responded to internal comments from WFWG

2  staff.  The SEIS, for example, acknowledged the uncertainty

3  related to short-term effects upon the owl, toad, and flycatcher,

4  and discussed in detail the proposed studies that would attempt

5  to address the gaps in scientific knowledge.  See SNFPA 3144-46,

6  3149-50.  Moreover, in response to concerns about long-term

7  modeling, the SEIS included additional disclosure of the

8  assumptions and limitations of such modeling.  See SNFPA 3461-

9  80.[15]  Accordingly, the SEIS responded to opposing viewpoints in

10  a manner sufficient for purposes of satisfying the requirements

11  of NEPA.

12    In addition to disclosing scientific uncertainty and

13  opposing viewpoints through the SEIS, its response to public

14  comments,[16] and the SCR, the Forest Service also acknowledged

15  scientific uncertainty in its ROD for the 2004 Framework.  SNFPA

16  3002 (explaining that the SCR was used to improve the SEIS and to

17  "acknowledge scientific uncertainty and differing points of

18  view").

19  ///

20  _____

21    [15] While Plaintiff takes issue with the reliability of
   modeling as a scientific tool to assess risks associated with
22  both wildlife and suitable habitat, claiming that such techniques
   are improper in the absence of error bars and quantified
23  confidence levels, as indicated above modeling is a legitimate
   projection tool where supported by a reasonable scientific basis,
24  and the Court concludes that such basis is present here. See
   Lands Council v. McNair, 2008 WL 2640001 at *8 (9th Cir. 2008).
25  The SEIS qualitatively discloses the limitations of the modeling
   in describing the methodology.  See SNFPA 3337, 3461-80, 3649-50.

26
    [16] Significantly, the SEIS provides some 137 pages of
27  responses to comments on the proposed 2004 Framework from the
   public, and further disclosed other viewpoints by including
28  copies of the major comments received from the State of
   California and other public entities.  SNFPA 3564-3933.

1    Scientific uncertainty is also addressed at some length in
2  the Scientific Consistency Review requested by the Forest
3  Service, which included analysis of 1) whether applicable and
4  available scientific information had been considered; 2) whether
5  scientific information had been interpreted reasonably and
6  accurately; 3) whether uncertainties associated with the
7  scientific information had been acknowledged; and 4) whether
8  risks and uncertainties had been identified and documented.
9  SNFPA 3504, 3526; see also SNFPA 2356, 3503-24 (explaining how
10 SEIS was improved based on SCR).

11   The Forest Service refined its analysis and discussion of
12 the spotted owl based on the SRC team's commentary.  See SNFPA
13 2578-2589; 2590-2601.  The Forest Service stated that "[m]ore
14 emphases and discussion on short-term effects and associated risk
15 [to the California spotted owl] was added to the SEIS and is
16 considered in the Adaptive Management Process."  SNFPA 2601.

17   In sum, after carefully examining the record, the Court
18 determines that the 2004 Framework was adequately considered
19 contradictory opinions through its acknowledgment of scientific
20 controversy and uncertainty concerning potential impacts of the
21 treatment proposals.  That consideration including references to
22 applicable literature in the SEIS, the SCR, and the ROD all
23 prepared in conjunction with the Framework.  The requirements of
24 NEPA are consequently satisfied.  See Seattle Audubon Soc'y v.
25 Lyons, 871 F. Supp. 1291, 1321 (W.D. Wash. 1994) (The agency
26 having engaged in numerous studies and analyses on the owl
27 satisfied NEPA's requirement to take a "hard look" at available
28 data).

1    The fact that an agency's approach has been critiqued, or
2    that alternative methodologies have been disclosed, does not
3    render an EIS arbitrary.  <u>See</u> <u>Edwardsen v. U.S. Dept. Of</u>
4    <u>Interior</u>, 268 F.3d 781, 786 (9th Cir. 2001).  It is well
5    recognized that "disagreement among the experts is inevitable
6    when the issues are at the 'very frontiers of scientific
7    knowledge,' and such disagreement does not preclude [courts] from
8    finding that the [agency's] decisions are adequately supported by
9    evidence in the record."  <u>Lead Indus. Ass'n, Inc. v. EPA</u>, 647
10   F.2d 1130, 1160 (D.C. Cir. 1980).  So long as contrary opinion is
11   adequately disclosed, an agency "is under no obligation to
12   conduct new studies in response to issues raised in the comments,
13   nor is it duty-bound to resolve conflicts raised by opposing
14   viewpoints."  <u>See</u> <u>California v. Block</u>, 690 F.2d 753, 773 (9th
15   Cir. 1982).

16   Additionally, the existence of uncertainty does not preclude
17   the agency from taking action, so long as that uncertainty has
18   been identified.  <u>See</u> <u>Village of False Pass v. Clark</u>, 733 F.2d
19   605, 614 (9th Cir. 1984), citing <u>Sierra Club v. Sigler</u>, 695 F.2d
20   963, 970 (5th Cir. 1983) ("the unavailability of information,....
21   should not be permitted to halt all government action... This is
22   particularly true when information may become available at a
23   later time and can still be used to influence the agency's
24   decision.").  Moreover, just because Plaintiff may disagree with
25   the Forest Service's impact assessment does not mean that the
26   court can "substitute its judgment for that of the agency as to
27   the environmental consequences of its actions."  <u>Kleppe v. Sierra</u>
28   <u>Club</u>, 427 U.S. 390, 410 n.21 (1976).

Instead, because its Framework adequately disclosed and addressed competing scientific viewpoints, the Forest Service's decision merits deference, and Plaintiff's NEPA challenge must accordingly be rejected.  See Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1301 (9th Cir. 2003) ("[An] agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints.").

Based on the foregoing, the Court concludes that the 2004 Framework satisfactorily addressed, for purposes of complying with NEPA, both scientific opposition and uncertainty with regard to its treatment proposals.

**D.  Adaptive Management**

The use of adaptive management is adequately explained in the SEIS, and the Forest Service reasonably has applied it to the 2004 Framework.  SNFPA 3136.  Adaptive management "policies and decisions are not viewed as final solutions but as hypotheses and opportunities for continued learning."  SNFPA 3137.  The monitoring and research initiatives of adaptive management provide data that can be reviewed and used to inform subsequent management decisions.  SNFPA 3141.  While Plaintiff objects to the scientific utility of adaptive management under the circumstances of this case, the Ninth Circuit's recent McNair decision makes it clear that choosing between and validating scientific methodologies is "not a proper role" for a federal court.  Lands Council v. McNair, 2008 WL 2640001 at *4.

62

1    Moreover, contrary to Plaintiff's assertion, the SEIS does

2    include discussion on funding for monitoring and surveying.  A

3    detailed discussion on funding for the adaptive management

4    monitoring and surveying is present in the record, and lists high

5    priority studies such as the California spotted owl canopy

6    reduction study.  SNFPA 3983-86.  Additionally, the Forest

7    Service has recognized that adaptive management is not a simple

8    approach and must be approached with "realistic expectations".

9    SNFPA 3002.  Recognizing the limits of a scientific methodology

10   does not invalidate its use.  Friends of Endangered Species, Inc.

11   v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985) (NEPA does not

12   require a court to decide whether an environmental document "is

13   based on the best scientific methodology available....").  Should

14   give deference to adaptive management.  Schultz, 992 F.2d at 981

15   ("We will not second-guess methodological choices made by an

16   agency in its area of expertise.").

17

18   **E.  Failure to Consider Reasonable Range of Alternatives**

19

20   Plaintiff contends that the 2004 Framework failed to analyze

21   a reasonable range of alternatives to the course of action

22   ultimately adopted, and asserts that this failure violates NEPA.

23   NEPA does require that federal agencies like the Forest

24   Service herein "produce an EIS that rigorously explores and

25   objectively evaluates all reasonable alternatives so that the

26   agency can sharply define the issues and provide a clear basis

27   for choice among options by the decisionmaker and the public to

28   consider alternatives to the proposed action."

1  <u>Kootenai Tribe of Idaho v. Veneman</u>, 313 F.3d 1094, 1120 (9th Cir.

2  2002) (citing 40 C.F.R. § 1502.14).  As the Ninth Circuit

3  explained, "NEPA regulations describe this alternatives

4  requirement as the 'heart' of the EIS."  <u>Id</u>.  An EIS is

5  inadequate for purposes of NEPA if it fails to address "[t]he

6  existence of a viable but unexamined alternative.  <u>Natural Res.</u>

7  <u>Def. Council</u>, 421 F.3d at 813.

8       According to Plaintiff, because the 2004 Framework analyzed

9  only two alternatives in any detail (the "no-action" alternative

10 of retaining the existing 2001 Framework and the proposed

11 modification constituting its 2004 successor), the Forest Service

12 failed to consider a reasonable range of alternatives as required

13 by NEPA.  The Forest Service counters this argument by asserting

14 that because the 2004 Framework was by definition a

15 "supplemental" environmental impact statement to the original

16 2001 version, the consideration of numerous alternatives

17 considered in conjunction with the 2001 Framework must

18 necessarily be incorporated by reference in the 2004 version

19 presently under scrutiny.  Plaintiff responds by alleging that

20 because the 2001 and 2004 Frameworks rely on different

21 assumptions and models to gage the environmental consequences of

22 the various alternatives, and because the alternatives developed

23 in 2001 were designed to address a significantly different

24 purpose and need than that identified in 2004, the 2004 Framework

25 cannot fall back to the alternative analyses contained within its

26 predecessor.

27 ///

28 ///

1    This viability of these competing arguments has recently
2    been squarely addressed by the Ninth Circuit within the context
3    of a decision overruling this Court's denial of a preliminary
4    injunction sought by Plaintiff to permit logging within three
5    site-specific proposals (Basin, Empire and Slapjack) approved by
6    the Forest Service for logging.  In Sierra Forest Legacy v. Rey,
7    ___ F.3d ___, 2008 WL 2097150 (9th Cir. May 15, 2008), the Ninth
8    Circuit looked specifically at whether or not the 2004 Framework
9    rigorously explored and objectively evaluated all reasonable
10   alternatives in analyzing whether plaintiffs had demonstrated a
11   probability of success on the merits for purposes of their
12   entitlement to preliminary injunctive relief.  It unequivocally
13   concluded that the Forest Service "cannot rely on its discussion
14   of alternatives in the 2001 FEIS to satisfy its requirement [that
15   reasonable alternatives be evaluated] for the 2004 FEIS.  Id. at
16   *2.

17       In reaching this conclusion, the Sierra Forest Legacy court
18   reasoned that because the Forest Service altered its modeling
19   techniques between the issuance of the 2001 FEIS and the 2004
20   SEIS but failed to update its analysis of the 2001 FEIS
21   alternatives to reflect these new techniques, changed
22   circumstances were present that rendered improper any reliance by
23   the 2004 Framework on its 2001 predecessor.  Id.  As the court
24   stated, "where changed circumstances affect the factors relevant
25   to the development and evaluation of alternatives," the Forest
26   Service "must account for such change in the alternatives it
27   considers.  Id., citing Natural Res. Def. Council, 421 F.3d at
28   813-14.

1    Given the Ninth Circuit's clear precedent on the very issue
2    presently before this Court, summary adjudication in Plaintiff's
3    favor must be granted as to Plaintiff's NEPA claim that the
4    Forest Service failed to sufficiently consider effects stemming
5    from full implementation of the HFQLG Act Pilot Project.

6

7                              **CONCLUSION**

8

9    Based on the foregoing, following careful review and
10   consideration of the parties' Cross Motions for Summary Judgment
11   in this matter, the Court finds in Plaintiff's favor as to the
12   State of California's claim, as set forth in the Fourth Cause of
13   Action, that the Forest Service failed to consider reasonable
14   alternatives to the 2004 Framework as required by NEPA.  The
15   Court otherwise GRANTS Defendants' request for summary
16   adjudication as to the remainder of the NEPA and APA claims
17   levied against the Framework in Plaintiff's First, Second, Third
18   and Fifth Causes of Action.[17]  As requested by the parties,
19   remedies issues with regard to Plaintiff's Fourth Cause of Action
20   shall be adjudicated following further briefing.
21   ///
22   ///
23   ///
24   ///
25   ///

26

27        [17] Because oral argument will not be of material assistance,
28   the Court orders this matter submitted on the briefs.  E.D. Cal.
     Local Rule 78-230(h).

1  The parties are directed to propose a briefing schedule to the
2  Court for its consideration not later than ten (10) days
3  following the date of this Memorandum and Order.
4       IT IS SO ORDERED.
5  Dated: August 18, 2008
6
7
8       MORRISON C. ENGLAND, JR.
       UNITED STATES DISTRICT JUDGE
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28